**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALEJANDRO TOLEDO,

    Plaintiff,

    v.

U.S. DEPARTMENT OF STATE, *et al.*,

    Defendants.

Civil Action No. 23-627 (BAH)

Judge Beryl A. Howell

<u>**MEMORANDUM OPINION**</u>

  Plaintiff Alejandro Toledo, who served as President of Peru from 2001 to 2006, has for the past several years been fighting his requested extradition to that country to face charges of collusion and money laundering. Despite his ongoing proceedings in the Ninth Circuit and the Northern District of California also challenging his extradition, plaintiff has turned to this Court to enjoin the United States Department of State from acting upon its final determination to extradite him to the Peruvian authorities, on the ground that the determination ran afoul of his constitutional due process rights. *See* Compl. ¶ 9, ECF No. 1; Pl.'s Mot. Prelim. Relief ("Pl.'s Mot.") at 1–2, ECF No. 5. Plaintiff cannot demonstrate a likelihood of success on the merits of his due process claim, however and accordingly, this alternative route to the same end he is simultaneously pursuing in federal court on the opposite coast of this country, fails and plaintiff's motion for a preliminary injunction and temporary restraining order is denied.

I.  **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

  Although this suit does not concern the merits of the underlying criminal prosecution in Peru, the allegations against plaintiff will be briefly outlined as relevant background for plaintiff's extradition proceedings. Then, because plaintiff's challenge is to the process he has

been afforded prior to the State Department's extradition determination, a detailed overview of

the United States' extradition process in general and the events to date in plaintiff's proceedings

is provided as context in assessing the instant complaint about insufficient process.

### A.      Underlying Criminal Charges

Plaintiff's legal troubles began in 2016 or 2017, when Peruvian authorities began

investigating allegations that plaintiff had participated in a massive money laundering scheme in

connection with the construction of a large highway project during his presidential term.  Compl.

¶ 32 (alleging the investigation began in early 2017); *id.*, Ex. B, WilmerHale White Paper to

Secretary of State and Letters of Support (Oct. 28, 2022) ("White Paper") at 2, 17, ECF No. 1-3

(dating the beginning of the investigation to 2016).  The investigation culminated in influence

peddling, collusion, and money laundering charges filed in mid-2018, accusing plaintiff of

soliciting and laundering millions of dollars in bribes from the Brazilian construction

conglomerate Odebrecht S.A.  *Id.* ¶ 33; Def.'s Opp'n Pl.'s Mot. Prelim. Relief ("Def.'s Opp'n"),

Ex. 1, Excerpts from Record of Peruvian Extradition Proceedings ("Peruvian Extradition

Record")) at 10–17, 162–66, ECF No. 9-1.[1]

Shortly after the investigation began, plaintiff relocated to the United States, where he is

a lawful permanent resident.  *See* Peruvian Extradition Record at 45–47.  While plaintiff has not

faced criminal charges in the United States related to his alleged role in the bribery scheme, the

United States has successfully pursued two civil forfeiture proceedings based on the same

underlying facts, resulting in the recovery and return to Peru of approximately $686,000 that

plaintiff and other members of his family had used to purchase real estate as part of a scheme

"designed to hide Toledo's ownership of the funds and their connection to Odebrecht."  *See*

---

[1]      Peru subsequently dropped the influence peddling charge.  *See In re Extradition of Toledo Manrique*, No. 19-mj-71055 (TSH), 2021 WL 8055543, at *2 (N.D. Cal. Sept. 28, 2021).

Department of Justice, Press Release No. 22-933 (Aug. 31, 2022), https://perma.cc/6FAE-34EX;

Def.'s Opp'n at 12 n.2.  The United States did prosecute the construction company Odebrecht,

which pled guilty in 2016 to a charge stemming from its own role in the bribery scheme; as part

of its plea agreement, Odebrecht stipulated to the fact that the scheme operated in Peru during

plaintiff's presidency.  *See* Department of Justice, Press Release No. 16-1515 (Dec. 21, 2016),

https://perma.cc/E3KW-694L; Odebrecht Plea Agreement (Dec. 21, 2016), Att. B, Statement of

Facts ¶¶ 20, 43, 65–66, https://www.justice.gov/opa/press-release/file/919916/download.

      Plaintiff maintains his innocence, arguing that the prosecution is politically motivated and

that the prosecution's lead witness, who has died since the beginning of the investigation and so

cannot be cross-examined, is untrustworthy.  Compl. ¶¶ 32, 34–35; Pl.'s Mem. Supp. Mot.

Prelim. Relief ("Pl.'s Mem.") at 16–18, ECF No. 6.  He has remained in California with his wife

through the pendency of his extradition proceedings.  *See* White Paper at 12; Pl.'s Mem. at 16.

      **B.**    **Extradition Proceedings Generally**

      As already noted, the instant suit is not Toledo's first attempt to stop his extradition to

Peru.  To situate the instant motion amid his other, long-running extradition proceedings, a brief

overview of the U.S.'s extradition process is in order.

      Extradition proceeds in two phases, taking place in the judicial and executive branches.

When a foreign government requests the extradition of an individual from the United States, the

first step is for the Department of State and the Department of Justice ("DOJ") to determine

whether the request satisfies the requirements of the applicable treaty between the United States

and the foreign government.  *See* Def.'s Opp'n, Ex. 2, Declaration of Oliver M. Lewis ¶ 2 (Mar.

20, 2023) ("Lewis Decl."), ECF No. 9-2.  If those treaty requirements are found to be met, the

DOJ commences proceedings, under 18 U.S.C. § 3184, before a judicial officer in federal court.

*Id.* ¶¶ 2–3  The judge is then responsible for holding a hearing or hearings to determine whether there is sufficient evidence to sustain the charges against the fugitive for which extradition is sought.  *See* 18 U.S.C. § 3184; Lewis Decl. ¶ 3.  These hearings are adversarial and allow the putative fugitive, through counsel, to present argument and evidence to prove that the requesting country's charges cannot be sustained.  *See id.*; 18 U.S.C. § 3184.  Upon determining that the fugitive is subject to extradition on any charge, the judge sends a certification of that finding to the Secretary of State.  *See id.*; Lewis Decl. ¶ 3.  That certification is not directly appealable, but the fugitive can still challenge the determination by filing a petition for a writ of habeas corpus, which is then ruled upon and appealed in the usual course.  *Id.* ¶ 4; 28 U.S.C. § 2241.  The habeas challenges may include whether the judge had jurisdiction, whether the charged offense is covered by the terms of the treaty, and whether the evidence presented establishes probable cause that the fugitive committed the charged offense.  *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *Vo v. Benov*, 447 F.3d 1235, 1240 (9th Cir. 2006).

If the judicial proceedings conclude with a certification of extraditability and the habeas petition, if filed, is denied absent a stay pending appeal, the Secretary of State then has the ultimate authority to decide whether the fugitive should be surrendered to the requesting country. *See* 18 U.S.C. § 3186; Lewis Decl. ¶ 4.  The State Department's decision rests on the entire record before the extradition court, including any issues raised in collateral habeas proceedings, but also incorporates political, humanitarian, or other concerns that were not, and often could not have been, before the court.  *Id.* ¶ 4; *see also Al-Anazi v. Bush*, 370 F. Supp. 2d 188, 194–95 (D.D.C. 2005) (noting the limited nature of a court's inquiry in extradition proceedings as compared to the Secretary of the State's).  "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as

questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

The executive branch phase proceeds according to a number of internal policies and regulations designed to ensure the ultimate extradition determination is consistent with United States and international law.  For example, the Secretary's decision must be consistent with the United States' obligations under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Torture Convention"), which means that part of the Secretary's extradition determination must include the conclusion that it is not more likely than not that the particular fugitive will be tortured if returned to the requesting country.  *See* Lewis Decl. ¶¶ 4–5 & n.2; 22 C.F.R. Part 95 (outlining the procedures to be followed in considering the question of torture in reaching an extradition decision).  The State Department follows similar procedures to evaluate other humanitarian concerns raised by a fugitive, even when those allegations may not amount to a claim cognizable under the Torture Convention.  Lewis Decl. ¶ 5.  Multiple offices, bureaus, and country desks within the State Department are brought in to analyze particular claims or information relevant to a case where they have regional or substantive expertise, and other government agencies are consulted when needed.  *Id.* ¶¶ 6–7. The U.S. Embassy in the requesting country, for instance, may provide information on the current political situation in that country, its judicial system, and the local conditions of detention.  *Id.* ¶ 7.

The fugitive, through counsel or otherwise, may participate in the executive branch phase by submitting materials to the State Department, including any written arguments and documentation or evidence relevant to the extradition determination.  *Id.* ¶ 8.  Any other

interested parties may also submit materials.  *Id.*  The State Department considers all materials submitted, and may seek further information on the issues raised from the fugitive or others, before reaching its decision.  *Id.*

At the conclusion of both these phases, the Secretary of State reaches its final decision to either surrender the fugitive to the requesting country, deny surrender of the fugitive, or condition the fugitive's surrender on certain assurances from the requesting state to protect against mistreatment in its criminal justice system.  *Id.* ¶ 9.  The ultimate decision to extradite an individual pursuant to a treaty stems from the Executive's Article II power to conduct foreign policy.  *See Sidali v. I.N.S.*, 107 F.3d 191, 194 (3d Cir. 1997) ("Because the power to extradite derives from the President's power to conduct foreign affairs, extradition is an executive, not a judicial function." (citing U.S. Const. art. II, § 2, cl. 2)).  As such, unlike in the judicial phase of the extradition proceedings, as plaintiff concedes, the final "decision is committed to the discretion of the Secretary of State and not otherwise reviewable."  Pl.'s Mem. at 8.

C.      **Toledo's Extradition Process**

Plaintiff brings the instant suit late in the extradition process described *supra*.  His proceedings began in early 2018, when the government of Peru—following adversarial legal proceedings in that country—requested plaintiff's extradition from the U.S. on collusion and money laundering charges stemming from the bribery scheme.  *See* Peruvian Extradition Record" at 165–66; Compl. ¶ 15.

1.      *2019–2021: Extraditability Certification Proceedings In the Northern District of California*

The judicial branch phase of plaintiff's extradition proceedings then commenced in mid-2019 before a magistrate judge in the Northern District of California.  *See In re Extradition of Toledo Manrique*, No. 19-mj-71055 (TSH) (N.D. Cal. July 15, 2019), ECF No. 2.  Plaintiff was

6

arrested and initially ordered detained for the pendency of the proceedings, but after oral argument was then released on bond following the onset of the COVID-19 pandemic.  *See id.*, 445 F. Supp. 3d 421, 422–24 (N.D. Cal. Mar. 19, 2020).  Over the following several months, the magistrate judge held two hearings, at which he considered the extradition record from Peru and which plaintiff, through counsel, attempted to rebut with his own evidence.  *See id.*, No. 19-mj-71055 (TSH), 2020 WL 5291903 (N.D. Cal. Sept. 4, 2020); *id.*, Minute Entry (N.D. Cal. Sept. 4, 2020), ECF No. 148; *id.*, 2021 WL 8055543, at *1–2, 4–9 (N.D. Cal. Sept. 28, 2021) (summarizing the previous years' worth of proceedings and disputed evidence).  These proceedings culminated in the magistrate judge's certification of plaintiff's extraditability, based upon findings that: (1) he had the authority and jurisdiction to conduct the extradition proceedings, (2) the extradition treaty between Peru and the United States was in full force and effect and covered the charged conduct, and (3) that, while "[t]he case against Toledo is not airtight," there was sufficient evidence to support "probable cause to believe that Toledo committed collusion and money laundering."  *Id.* at *2, 19.

The next day, the DOJ sent a letter to Toledo, through counsel, explaining the next steps of the extradition proceedings.  *See* Def.'s Opp'n, Ex. 3, DOJ Letter to Counsel for Toledo (Sept. 29, 2021), ECF No. 9-3.  The letter explained that the executive branch phase of the proceedings would commence, provided instructions for Toledo's participation in that phase by submitting materials to the State Department, and summarized his options for challenging the judicial extradition certification through habeas proceedings.  *Id.* at 1–2.

## 2.   *2021–2022: Habeas Proceedings in Northern District of California*

Plaintiff duly pursued his judicial challenges, filing a habeas corpus petition one month later challenging the magistrate judge's certification decision on the grounds that the Peru-U.S. extradition treaty did not apply to him under the circumstances and that the magistrate judge had

erred in several of his evidentiary rulings and in his ultimate probable cause finding.  *See* Pet., *Manrique v. O'Keefe*, No. 21-cv-8395 (LB) (N.D. Cal. Oct. 28, 2021), ECF No. 1; *id.*, 2022 WL 1212018, at *1 (N.D. Cal. Apr. 22, 2022).  Another magistrate judge in the Northern District of California denied that petition, *id.* at *14, and shortly thereafter denied plaintiff's request for a stay of extradition pending his habeas appeal, *id.*, 2022 WL 2116832, at *1 (N.D. Cal. June 13, 2022).  Plaintiff then sought a stay from the Ninth Circuit for the pendency of his habeas appeal, which was also denied.  *See* Order, *Manrique v. Kolc*, No. 22-15705 (9th Cir. Oct. 19, 2022), ECF No. 22.

### 3.    *2022–2023: State Department Consideration of Extradition*

In the absence of a stay, the State Department began work on its portion of the extradition proceedings.  Plaintiff, through counsel, participated in this phase by corresponding with State Department representatives by email regarding the status of both the judicial and executive branch proceedings; submitting a white paper detailing evidence and arguments to support his request for a denial of extradition; submitting letters of support from interested third parties; and repeatedly supplementing the arguments in the white paper with additional submissions via email.  *See* White Paper; Compl., Ex. C, Email Correspondence Through October 28, 2022, ECF No. 1-4; *id.*, Ex. D, Email Correspondence Through December 7, 2022, ECF No. 1-5; *id.*, Ex. E, Email Correspondence Through December 29, 2022, ECF No.1-6.  The State Department confirmed receipt and review of all the substantive submissions as part of its deliberative process, which also included its review of the records in both the extradition and habeas cases and other information regarding Peru.  *See id.*, Exs. C–E.

On February 21, 2023, the State Department notified plaintiff that the Deputy Secretary of State, acting under authority delegated by the Secretary, *see* Lewis Decl. ¶ 3 n.1, had reached its final decision to surrender him to the Peruvian authorities.  Compl., Ex. A, Department of

State Letter to Counsel for Toledo (Feb. 21, 2023) ("Dep't of State Extradition Decision"), ECF 1-2.  Plaintiff, through counsel, urged the State Department to reconsider in another emailed submission reiterating the arguments made in his white paper and previous emails.  *Id.*, Ex. F, Email Correspondence Through February 28, 2023 at 4–7, ECF No. 1-7.  The State Department again confirmed receipt, offered assurances that it had "carefully considered" the arguments presented as part of its internal processes, but did "not see a basis to reconsider the February 21 decision" to extradite plaintiff, which decision it "confirmed . . . complies with the United States' domestic and international legal obligations."  *Id.* at 3–4.

      **4.**      *2023: Extradition Stay Proceedings in Northern District of California and Pending Appeal Before the U.S. Court of Appeals for the Ninth Circuit*

In response, plaintiff once again moved to stay his extradition in the Northern District of California before a magistrate judge, who once again denied the request, while granting a temporary stay to allow him to pursue a renewed motion to stay before the Ninth Circuit.  *See* Order, *Manrique v. O'Keefe*, No. 21-cv-8395 (N.D. Cal. Feb 23, 2023), ECF No. 36.  Plaintiff filed the latter motion days later.  *See* Mot., *Manrique v. Kolc*, No. 22-15705 (9th Cir. Feb. 27, 2023), ECF No. 41.  The magistrate judge's temporary stay of plaintiff's extradition remains in effect until the Ninth Circuit decides the pending motion.  *See* Compl. ¶ 19; Email Correspondence Through February 28, 2023 at 4.

The Ninth Circuit heard argument on plaintiff's habeas challenges and the renewed motion to stay on March 6, 2023.  *See* Minute Entry, *Manrique v. Kolc*, No. 22-15705 (9th Cir. March 6, 2023), ECF No. 44.

      **5.**      *2023: Pending Remand to Custody Proceedings in the Northern District of California*

Meanwhile, following its determination to surrender plaintiff to the Peruvian authorities, the State Department filed a motion in the Northern District of California, before the first

magistrate judge who issued the certification, seeking that plaintiff be remanded to custody.  *See* Mot., *In re Extradition of Toledo Manrique*, No. 19-mj-71055 (TSH) (N.D. Cal. Feb. 22, 2023), ECF No. 211.  That motion for remand was argued on March 9, 2023 and remains under advisement.  *See id.*, Minute Entry (N.D. Cal. March 9, 2023), ECF No. 218.

### 6.    *March 2023: Instant Complaint*

With the two motions in the Ninth Circuit still pending and the bail proceedings in the Northern District of California ongoing, plaintiff turned his sights to the opposite coast, initiating the instant suit the day after his argument before the Ninth Circuit.  *See* Compl. at 23.  Per plaintiff, this civil suit is nominally different from his previous challenges, because it challenges the executive branch phase of the extradition process under the Due Process Clause of the U.S. Constitution, as opposed to the findings in the judicial branch phase (i.e., the applicability of the Peru-U.S. treaty, probable cause that plaintiff committed the charged offenses, and plaintiff's entitlement to habeas corpus relief).  *See* Compl. ¶ 20; Pl.'s Mem. at 25.  Here, his single claim is that, despite the State Department's acknowledged "broad discretion in making extradition decisions," its ultimate extradition decision was nonetheless made in violation of the Due Process Clause because it did not "disclose the unclassified bases for its decision" or "afford Dr. Toledo and his counsel an opportunity to rebut those bases in a full and fair exchange of views." Compl. ¶¶ 55, 59.  Among other requested relief, he seeks an order enjoining enforcement of the State Department's extradition decision, requiring further process, and declaring that he cannot be remanded to custody.  *Id.* at 22 ("Requested Relief").  Thus, despite the distinct legal basis for the instant action, plaintiff's desired outcome is the same as in his pending Ninth Circuit and Northern District of California proceedings: to block his extradition by the State Department.

Less than a week after filing the new suit, plaintiff moved "for a temporary restraining order and/or preliminary injunction" enjoining the State Department from taking him into

custody or surrendering him for extradition.  *See* Pl.'s Mot. at 1.  The parties' proposed briefing schedule was adopted, *see* Minute Order (March 16, 2023), and the motion became ripe for resolution on March 23, 2023.  *See* Pl.'s Reply Supp. Mot. Prelim. Relief ("Pl.'s Reply"), ECF No. 10 (filed just before midnight on March 22, 2023).  Perhaps in recognition of the fact that multiple previous hearings have been held in interrelated issues over the past several years in the extradition proceedings in the Northern District of California and before the Ninth Circuit, neither party requested a hearing, *see* Pl.'s Mot. at 1; Def.'s Joint Proposed Briefing Sched. at 1, ECF No. 8, and accordingly the motion will be decided on the papers.  *See* D.D.C. LCvR 65.1(d) ("On request of the moving party together with a statement of the facts which make expedition essential, a hearing on an application for preliminary injunction shall be set by the Court . . . unless the Court earlier decides the motion on the papers[.]").

## II.     LEGAL STANDARD

In evaluating a motion for both a temporary restraining order and preliminary injunctive relief, generally the same standard is applied.  *See Sampson v. Murray*, 415 U.S. 61, 86 (1974) (confirming that "a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must conform to the standards applicable to preliminary injunctions"); *Nat'l Mediation Bd. v. Air Line Pilots Ass'n, Int'l*, 323 F.2d 305, 305 (D.C. Cir. 1963) (per curiam) (noting that "[a]n order extending a temporary restraining order beyond the 20 days allowed by Civil Rule 65(b) is tantamount to the grant of a preliminary injunction").

A temporary restraining order or a preliminary injunction "is an extraordinary . . . remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on each of four factors.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per

curiam) (emphasis omitted) (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL
PRACTICE AND PROCEDURE § 2948, at 129–30 (2d ed. 1995)).  To obtain relief, the moving party
must establish that (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer
irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his
favor"; and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555
U.S. 7, 20 (2008); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (per curiam);
*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *Pursuing Am.'s
Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016).  The first factor is "[a] foundational
requirement for obtaining preliminary injunctive relief."  *Guedes v. Bur. of Alcohol, Tobacco,
Firearms and Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019); *see also Aamer v. Obama*, 742 F.3d
1023, 1038 (D.C. Cir. 2014) (highlighting the first factor as the "most important factor"); *Munaf
v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must
demonstrate, among other things, 'a likelihood of success on the merits.'" (quoting *Gonzales v.
O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006))).[2]

## III.   DISCUSSION

The parties dispute plaintiff's establishment of all four preliminary relief factors, but
focus their arguments primarily on the first: whether plaintiff is likely to succeed on the merits of
his due process challenge.  *See* Pl.'s Mem. at 23–36; Def.'s Opp'n at 15–25; Pl.'s Reply at 8–16.
Upon consideration of the parties' submissions and the record of the underlying extradition
proceedings, the Court concludes the Due Process Clause does not mandate further procedure

---

[2]       The D.C. Circuit has previously followed a "sliding scale" approach to evaluating preliminary injunctions,
but that approach is likely inconsistent with *Winter*, *see Archdiocese of Wash. v. Wash. Metro. Area. Transit Auth.*,
897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale'
approach to weighing the four factors be abandoned"); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295–
96 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that "this Circuit's traditional sliding-scale approach to
preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf*),
and therefore will not be employed here, *see Singh v. Carter*, 185 F. Supp. 3d 11, 16–17 (D.D.C. 2016).

than plaintiff in fact received.  As such, plaintiff does not establish a likelihood of success on the merits of this litigation, and is therefore not entitled to preliminary relief, obviating the need to address the remaining factors.  *See Guedes*, 920 F.3d at 10.

Plaintiff's core argument is that his extradition proceedings fell short of constitutional due process because in the executive branch phase, the State Department did not, as part of its review of his case, "disclose the unclassified information regarding its decision and afford [plaintiff] an opportunity to be heard, including an opportunity to rebut the factual premises and other bases for the decision."  *See* Pl.'s Mem. at 24.  In support, he cites a series of cases that have held that executive branch determinations in other contexts must include at least these elements to comport with due process.  *See id.* at 23–25 (citing *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 319 (D.C. Cir. 2014); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); *People's Mojahedin Org. of Iran* ("*PMOI*") *v. U.S. Dep't of State*, 613 F.3d 220, 227 (D.C. Cir. 2010); *Nat'l Council of Resistance of Iran v. U.S. Dep't of State* ("*NCRI*"), 251 F.3d 192, 209 (D.C. Cir. 2001); *Chai v. Dep't of State*, 466 F.3d 125, 132 (D.C. Cir. 2006)).

The government goes to great lengths to distinguish these cases, arguing for a host of reasons that the different contexts of these non-extradition decisions warranted the application of different due process requirements than are implicated here.  *See* Def.'s Opp'n 20–25.  For instance, as the government explains, *Hamdi* concerned "a U.S. citizen's detention under the law of war, a much weightier context warranting . . . additional process" than that of the extradition of a fugitive, *id.* at 20, while *NCPR*, *Chai*, and *PMOI* concerned a specific statute applicable to the designation of foreign terrorist organizations that strictly limited the designated organizations' participation in the judicial review of the administrative decision, which has no analog in the extradition context, *id.* at 21.  Finally, the government argues that *Ralls*, which

concerned the President's statutory authority to suspend or prohibit foreign investment in the United States, "expressly confined its due process holding to Presidential actions pursuant to statute, rather than Presidential actions pursuant to Article II authority" like extradition determinations, and that the substantive standards imposed by the foreign divestment statute implicate specific record development concerns not present in extradition, which is subject to the Secretary of State's broad discretion. *Id.* at 22–24.

These are all valid distinctions, but the cited cases are inapposite for an even more fundamental reason. Plaintiff's cases all concern standalone administrative determinations that in and of themselves have the potential to deprive the interested party of life, liberty, or property, and therefore that require the meaningful participation of that party to comport with the Due Process Clause. Plaintiff makes much of the fact that the Secretary of State's extradition decision is final and non-reviewable to depict this decision, too, as a discrete administrative determination that would require an opportunity for a hearing and other process. *See* Pl.'s Mem. at 23–26. This blinkered perspective on the Secretary's extradition decision is strained and unpersuasive. In reality, the Secretary of State's final determination does not stand in a vacuum, but comes after—and is reliant upon—a substantial amount of other process also focused on the determination of the fugitive's extraditability, in which the fugitive has already been a key participant.

For plaintiff, the Secretary's determination represents merely the final step in what has been a multi-year-long opportunity for him, with the assistance of counsel, to present evidence and develop the record through adversarial proceedings, to participate in multiple hearings before several judges, to attack collaterally the resulting judicial determinations in habeas, and to supplement the record with unlimited written submissions to the Department of State. Plaintiff

has thus been given ample process prior to the Secretary's decision to surrender him to the

Peruvian authorities, and that final decision was made in reliance on the record generated

through all that came before.  *See* Dep't of State Extradition Decision (confirming that its

decision came "[f]ollowing a review of all pertinent information, including all the materials

[plaintiff's counsel] submitted directly to the Department of State on behalf of Mr. Toledo, as

well as the materials and filing submitted in the U.S. District Court for the Northern District of

California and the U.S. Court of Appeals for the Ninth Circuit on behalf of Mr. Toledo,

information regarding the current situation in Peru, and other relevant information").  When the

Secretary's final determination is viewed in the context of plaintiff's multiple years of

extradition proceedings, what becomes patently clear is that plaintiff received the equivalent, if

not far more, of the process he argues he was entitled to under his cited caselaw.

   The Due Process Clause does not mandate that plaintiff be given yet more process at this

final stage of the proceedings.  The amount of process "due" in a given situation turns on the

balancing of (1) "the private interest that will be affected by the official action;" (2) "the risk of

an erroneous deprivation of such interest through the procedures used, and the probable value, if

any, of additional or substitute procedural safeguards;" and (3) "the Government's interest,

including the function involved and the fiscal and administrative burdens that the additional or

substitute procedural requirement would entail."  *Mathews v. Eldridge*, 424 U.S. 319, 355

(1976).  While plaintiff's private liberty interest is indisputably implicated by his extradition

proceedings, the risk of an erroneous deprivation absent an additional hearing conducted by the

State Department and the furnishing of any unclassified documents relied upon is minimal, as is

the potential probable value of that additional procedure, given plaintiff's active role (including

in multiple hearings) in developing the record in his judicial proceedings and challenging the key

determinations there, not to mention his ability to supplement the record in whatever way he wished before the State Department.  Further, requiring the State Department to provide the additional opportunities for participation plaintiff requests would unnecessarily overtax Department resources without meaningfully expanding the scope of information considered and risks chilling the Department's ability to freely obtain information and assurances from relevant foreign governments, which might be less willing to speak frankly if the information disclosed was not kept confidential.  *See* Lewis Decl. ¶¶ 7, 11–14.

    Unsurprisingly, then, other courts to have considered the totality of the United States' extradition process have easily concluded that this combination of the judicial and executive branch proceedings comports with the requirements of the Fifth Amendment, in light of the substantial process afforded in the judicial phase and the executive's broad discretion to decide matters of foreign policy.  *See, e.g.*, *Venckiene v. United States*, 929 F.3d 843, 863–64 (7th Cir. 2019) (explaining that because "[a]n extradition case does not reach the Secretary of State" before the "ample procedural protections" of the judicial branch phase have been followed, there was no basis to require additional procedure "in the executive portion of the extradition process"); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir. 1997) (rejecting a due process-based argument for an additional hearing, as "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function"); *Escobedo v. United States*, 623 F.2d 1098, 1104–05 (5th Cir. 1980) (rejecting a due process argument because the "[e]xecutive discretion" in an extradition case arises only after substantial process in the judicial phase, which "safeguard[s] the fugitive's due process rights"); *Peroff v. Hylton*, 563 F.2d 1099, 1102–03 (4th Cir. 1977) (same); *Juarez-Saldana v. United States*, 700 F. Supp. 2d 953, 961–62 (W.D. Tenn. 2010) (same).  Plaintiff cannot avoid

16

the same conclusion here by demanding that a single step in a lengthy process be analyzed in isolation, misleadingly characterizing the Secretary's final decision as involving a "near-complete lack of any process."  Pl.'s Mem. at 28.  Plaintiff received the process due under the Fifth Amendment in his extradition proceedings.

***

While the merits of plaintiff's claim have been disposed of, a final point bears belaboring, for the foregoing cases also highlight a peculiarly inappropriate aspect of plaintiff's requested relief in this case.  Strikingly, the due process holdings in these cases all arose in the course of the fugitives' habeas challenges to their judicial extradition determinations.  Here, by contrast, plaintiff has chosen to bring his Fifth Amendment claim in a fresh lawsuit, before a different judge sitting on a different court, rather than in his ongoing habeas proceedings.

Plaintiff could have raised this same due process argument before the Northern District of California and the Ninth Circuit, as all the fugitives before the other courts to have faced this argument were able to do in their habeas proceedings.  Indeed, perhaps he did—the Ninth Circuit heard argument in plaintiff's case mere weeks ago, and that panel may well have something to say about due process in its eventual decision.

More likely, though, plaintiff has opted for this unprecedented procedural gambit to avoid clearly unfavorable precedent extant in the Ninth Circuit.  *See Lopez-Smith*, 121 F.3d at 1326.  Perhaps plaintiff hopes that by obtaining preliminary relief here, he would set this Court against those in the Ninth Circuit and the Northern District of California, which are already considering the government's ability to detain and extradite him.  This kind of forum shopping is anathema to our judicial system.  The five judges involved in plaintiff's long-running West coast proceedings (two magistrate judges and a panel of appellate judges) have the benefit of years of

17

familiarity with plaintiff's case and a substantial record before them, developed through multiple rounds of adversarial briefing, hearings, and argument, on which they are able to base their findings of probable due cause and other relevant conclusions.  Plaintiff is now attempting an end-run around their final decisions on his case by receiving fresh consideration from a judge on the opposite coast, to whom he has furnished a highly selective and misleading presentation of the factual background, *see* Def.'s Opp'n at 27 n.9 (detailing how "several of Toledo's statements appear to overstate the facts"), and requiring an expedited decision on an emergency motion for preliminary relief.  The irony is striking that plaintiff would engage in such abuse of the judicial process in order to complain that he has not, in fact, received enough process.  This Court will not call a halt to the elaborate procedures already in motion regarding plaintiff's extradition.

## IV.  CONCLUSION

For the foregoing reasons, plaintiff has failed to demonstrate a likelihood of success on the merits of his due process claim.  Consequently, the Court need not "proceed to review the other three preliminary [relief] factors," as plaintiff has failed to meet his burden of establishing entitlement to the extraordinary remedy sought.  *Guedes*, 920 F.3d at 10 (quoting *Arkansas Dairy Coop. Ass'n v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009)).  His motion for a preliminary injunction and a temporary restraining order is therefore DENIED.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: March 28, 2023

_____
BERYL A. HOWELL
U.S. District Court Judge