**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ALEJANDRO TOLEDO,** | |
| Plaintiff, | |
| v. | Case No.  1:23-cv-00627-BAH |
| **U.S. DEPARTMENT OF STATE,** | **ORAL ARGUMENT REQUESTED** |
| **WENDY SHERMAN,** in her capacity as U.S. Deputy Secretary of State | |
| Defendants. | |

## MOTION FOR RECONSIDERATION

## AND MEMORANDUM IN SUPPORT THEREOF

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ........................................................4

I.   Extradition Proceeds in Two Phases: The Judicial Phase and The Executive Phase ............. 4

    a.   The Judicial Phase Requires Courts To Decide Whether An Individual Is
       Extraditable ............................................................................................................. 4

    b.   The Executive Phase Requires The Department of State To Decide
       Whether To Extradite An Individual Found By Courts To Be Extraditable ......... 5

II.  The Motion for Preliminary Relief ................................................................... 8

LEGAL STANDARD FOR RECONSIDERATION ......................................................8

ARGUMENT ......................................................................................................................9

I.   Dr. Toledo Was Right To Pursue His Due Process Claim In This Court............................... 9

II.  Dr. Toledo Did Not Bring His Due Process Claim In This Court For Any
    Inappropriate Reason ...................................................................................... 12

III. Dr. Toledo Is Likely To Succeed On The Merits of His Due Process Claim ...................... 13

    a.   The Department of State Has An Independent Obligation To Afford Due
       Process In The Executive Phase of Extradition .................................................... 14

    b.   The Department of State's Mere Review of Materials Did Meet Due
       Process Requirements ........................................................................................... 19

        i.    Dr. Toledo Has a Strong "Private Interest" In Life and Liberty .............. 19

        ii.   Additional Procedural Safeguards Are Needed To Mitigate The
          Risk of An Erroneous Deprivation Of Liberty ......................................... 20

        iii.  The Burdens of Additional Process on the Government Are
          Minimal...................................................................................................... 30

IV.  The "Evidence" In Peru's Criminal Case Is Flawed and Unreliable.................................... 30

V.   Dr. Toledo Renews His Request For Oral Argument........................................................... 32

# TABLE OF AUTHORITIES

Page(s)

## CASES

\* *Chai v. U.S. Dep't. of State*, 466 F.3d 125 (D.C. Cir. 2006) ............................................. *passim*

*Eain v. Wilkes*, 641 F.2d 504 (7th Cir. 1981) ...............................................................18

*Escobedo v. United States*, 623 F.2d 1098 (5th Cir. 1980)................................................15, 16

*Fernandez v. Phillips*, 268 U.S. 311 (1925) ...............................................................4, 11, 17

*Gray Panthers v. Schweiker*, 652 F.2d 146 (D.C. Cir. 1980) .................................................16, 23

*Greene v. McElroy*, 360 U.S. 474 (1959) ...................................................................16, 23

\* *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ...........................................................*passim*

*Hooker v. Klein*, 573 F.2d 1360 (9th Cir. 1978)..............................................................17

*Hurtado v. United States Atty. Gen.*, 401 F. App'x 453 (11th Cir. 2010)..................................7, 18

*Lamont v. Haig*, 590 F.2d 1124 (D.C. Cir. 1978)..............................................................10

*Lopez-Smith v. Hood*, 121 F.3d 1322 (9th Cir. 1997).........................................................12, 13, 26

*Martin v. Warden, Atl. Pen., U.S. Marshall Service*, 993 F.2d 824 (11th Cir. 1993)....3, 14, 17, 22

*Mathews v. Eldridge*, 424 U.S. 319 (1976)...................................................................19

\* *Nat'l Council of Resistance of Iran (NCRI) v. U.S. Dep't. of State*, 251 F.3d 192 (D.C. Cir. 2001) ........................................................................... *passim*

*Ordinola v. Hackman*, 478 F.3d 588 (4th Cir. 2007).........................................................6, 17

\* *People's Mojahedin Org. of Iran (PMOI) v. U.S. Dep't. of State*, 613 F.3d 220 (D.C. Cir. 2010) (per curiam) .................................................................... *passim*

*People's Mojahedin Organization of Iran v. Department of State*, 182 F.3d 17 (D.C. Cir. 1999) ..........................................................................24

*Peroff v. Hylton*, 563 F.2d 1099 (4th Cir. 1977)..............................................................15

\* *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296 (D.C. Cir. 2014) ................. *passim*

*Starnes v. McGuire*, 512 F.2d 918 (D.C. Cir. 1974)......................................................9

*United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253
(D.D.C. 2016) ............................................................................................8

*United States v. Kin-Hong*, 110 F.3d 103 (1st Cir.1997)..........................................7, 18

*Vasser v. McDonald*, 72 F. Supp. 3d 269 (D.D.C. 2014) ............................................10

*Venckiene v. United States*, 929 F.3d 843 (7th Cir. 2019)
.................................................................................................... *passim*

*Vo v. Benov*, 447 F.3d 1235 (9th Cir. 2006) ......................................................5, 11

*Wultz v. Islamic Republic of Iran*, 762 F. Supp. 2d 18 (D.D.C. 2011) ...........................8

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) ....................................24

## STATUTES, RULES, AND REGULATIONS

22 C.F.R. § 95 ....................................................................................................6

18 U.S.C. § 3184 ................................................................................................4

28 U.S.C. § 1391 ...........................................................................................9, 10

28 U.S.C. § 2241 ................................................................................................4

Fed. R. Civ. Pro. 54(b) ......................................................................................8

## DOCKETED CASES

*In the Matter of Extradition of Alejandro Toledo Manrique*,
No. 19-mj-71055 (N.D. Cal.)..........................................................................31

*Manrique v. Kolc*,
No. 22-15705 (9th Cir.) ..............................................................................5, 11

*Manrique v. O'Keefe*,
No. 21-cv-08395 (N.D. Cal.) ..........................................................................10

## OTHER AUTHORITIES

*Alan García: Peru's Former President Kills Himself Ahead of Arrest*, BBC
NEWS (Apr. 17, 2019), https://www.bbc.com/news/world-latin-america-
47965867............................................................................................................28

*Avoid Contradictions*, The Intercept (Nov. 3, 2019),
https://theintercept.com/2019/11/03/peru-operation-car-wash-prosecutors/ ....................30

McFarland Sánchez-Moreno, *Democracy is on the Line in Peru*, Human Rights
   Watch (Jan. 24, 2023), https://www.hrw.org/news/2023/01/24/democracy-
   line-peru ......................................................................................................27

Neves et al., *In Peru's Operation Car Wash, Prosecutors and Witness Doctored
   Testimony to Avoid Contradictions*, The Intercept (Nov. 3, 2019),
   https://theintercept.com/2019/11/03/peru-operation-car-wash-prosecutors/ ....................30

Rochabrun, Marcelo, *Peru Is Running Out of Space to Keep its Jailed Ex-
   Presidents*, BLOOMBERG (Feb. 24, 2023),
   https://www.bloomberg.com/news/articles/2023-02-24/peru-is-running-
   out-of-space-to-keep-its-jailed-ex-
   presidents#:~:text=The%20politically%2Dvolatile%20Andean%20nation,
   has%20faced%20a%20detention%20order.&text=After%20a%20lengthy
   %20process%2C%20Peruvian%20officials%20said%20Feb .........................................28

United Nations, Comm'n on Human Rights, *Report of the Special Rapporteur on
   Torture and Other Cruel, Inhuman or Degrading Treatment or
   Punishment* ¶ 43, E/CN.4/2004/56 (Dec. 23, 2003),
   https://www.refworld.org/docid/45377acc0.html ...............................................6

Manfred Nowak, United Nations, Human Rights Council, *Report of the Special
   Rapporteur on Torture and Other Cruel, Inhuman or Degrading
   Treatment or Punishment: Addendum* ¶ 234, A/HRC/13/39/Add.5, (Feb. 5,
   2010), https://www.refworld.org/docid/4cf8f3192.html ....................................6

U.S. Department of State, 7 Foreign Affairs Manual § 1635 ......................................10

U.S. DEP'T OF STATE, PERU 2022 HUMAN RIGHTS REPORT (2023),
   https://www.state.gov/reports/2022-country-reports-on-human-rights-
   practices/peru/ .............................................................................................6, 27

World Justice Project 2022 Rule of Law Rankings,
   https://worldjusticeproject.org/rule-of-law-
   index/country/2022/Peru/Criminal%20Justice/ ................................................18, 25, 27

## INTRODUCTION

Plaintiff Dr. Alejandro Toledo ("Dr. Toledo" or "Plaintiff") respectfully submits this Motion for Reconsideration of the Motion for Preliminary Relief, ECF No. 5, which this Court denied in its Order, March 28, 2023, ECF No. 12, and Memorandum Opinion, March 28, 2023, ECF No. 13 ("Opinion").

*   *   *   *   *

In its Opinion, this Court criticized what it deemed to be inappropriate forum shopping. Opinion at 17-18.  We respectfully disagree with that characterization of this litigation, which we continue to pursue in good faith, consistent with the law and applicable venue rules.  We filed the Motion for Preliminary Relief, and now file this Motion for Reconsideration, not as part of any abusive or inappropriate "gambit," Opinion 17, but because it is our genuine belief—supported by the facts and the reasoning of the D.C. Circuit—that our client's claim is meritorious under the Constitution, based upon a lack of due process in the executive phase of these proceedings.  Moreover, it is imperative that Dr. Toledo be afforded the process he is due at the Department of State because that is the only part of the U.S. government that is permitted to consider that Dr. Toledo is the victim of a deeply flawed and wrongful political prosecution in Peru, where prosecutorial misconduct is rampant and the criminal justice system ranks among the worst in the world—well below countries like China, Nigeria, Sudan, and Iran.  If Dr. Toledo were to be extradited, he would likely be held in prolonged pretrial detention, where—given his age (78) and ailing health—he may die without ever seeing the inside of a courtroom.  Even if he were to survive, any trial would occur (if at all) some two decades or more after the events in question, in a judicial system that lacks independence and impartiality, and is incapable of rendering justice in this case.  Under these circumstances, extraditing Dr. Toledo likely will mean that he will spend the rest of his life in a Peruvian jail, without any trial or due process.

The Department of State has said it "reviewed" and "considered" this information, but it afforded Dr. Toledo no other process before making its decision.  Dr. Toledo's liberty and possibly life turn on the Department's decision, yet the Department refused to meet with him or his counsel, disclosed no information, declined to answer basic questions, and refused to afford Dr. Toledo or his counsel any opportunity to learn and rebut the facts and premises underlying its decision.  The Due Process Clause requires more of an executive agency when it decides an individual's fate, as it has here.

*      *      *

Contrary to the Court's expressed concern, Opinion at 17, Plaintiff did not file his action in this Court for any improper purpose, such as avoiding precedent in the Ninth Circuit.  Rather, Plaintiff filed his due process claim in this Court, and not the Northern District of California, because (1) this is where Defendants are located; (2) this is where the events in question took place; (3) this is where the relevant records and witnesses are located; and (4) there are no such connections to the Northern District of California, where the proceedings have been limited to the judicial phase of extradition and were nearly concluded by the time the executive phase of extradition gave rise to this due process claim.

Plaintiff respectfully submits that reconsideration is warranted and the Motion for Preliminary Relief should be granted, for two reasons.  First, the Court erred in its analysis of an executive-branch process by relying substantially on a separate judicial-branch process that preceded it.  Opinion at 14-15.  The executive-branch process should have been analyzed separately from the judicial-branch process because each of the two branches is responsible for deciding different issues in relation to extradition, and each has its own due process requirements under the Constitution.  *See, e.g.*, *Venckiene v. United States*, 929 F.3d 843, 863-864 (7th Cir.

2019) (separately analyzing due process challenges to the judicial phase and executive phase of extradition and holding that the Due Process Clause applies separately to each); *accord Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 829 (11th Cir. 1993) ("Extradition ultimately remains an Executive function. … The United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution.  The constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations.").  Second, the Court erred in its conclusion that the Department of State's mere "review" of information is sufficient to satisfy constitutional due process requirements in the executive phase of extradition, where an individual's liberty interest is at stake.  *See, e.g.*, *Ralls Corp. v. Comm. on Foreign Inv. in U.S.,* 758 F.3d 296, 319 (D.C. Cir. 2014) ("[D]ue process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence.").

The Court rightly notes that Plaintiff received substantial process in the judicial phase of extradition, Opinion at 14, but that phase preceded the executive phase, was conducted separately, and was strictly limited to certain narrow issues that did not include the final agency determination at issue here.  In the executive phase, where the government made the ultimate decision affecting Plaintiff's liberty, he received virtually no process at all.  Specifically, the Department of State disclosed no information to him or his counsel, declined to meet with him or his counsel, and declined to afford him or his counsel any opportunity to learn and rebut any of the unclassified facts or evidence underlying the decision.  The Due Process Clause requires more of the Department of State's process when the liberty and (perhaps) life of a U.S. resident are at stake.  For these reasons, Plaintiff respectfully requests urgent reconsideration of his Motion for Preliminary Relief and a hearing and oral argument of the instant Motion.

3

## BACKGROUND AND PROCEDURAL HISTORY

**I.      Extradition Proceeds in Two Phases: The Judicial Phase and The Executive Phase**

As the Court correctly notes, "extradition proceeds in two phases."  Opinion at 3.  The first phase occurs before the judicial branch in U.S. courts, while the second phase proceeds before the executive branch in the U.S. Department of State (the "Department").  *Id.*

**a.      The Judicial Phase Requires Courts To Decide Whether An Individual Is Extraditable**

In the judicial phase of extradition, U.S. courts decide whether an individual is extraditable as a matter of law.  Opinion at 3-4 (citing 18 U.S.C. § 3184).  This question of extraditability turns on whether (1) the extradition treaty requirements have been met, and (2) there is sufficient evidence to sustain the charges against the requested individual.  Opinion at 4 (citing Def.'s Opp'n Br. ("Def.'s Opp'n"), Ex. 2, Decl. of Oliver M. Lewis ¶¶ 2-3, Mar. 20, 2023 ("Lewis Decl."), ECF No. 9-2)).  The proceedings in the judicial phase are adversarial, so the requested individual is afforded an opportunity in court to contest his extraditability.  *Id.*  If the court rules that the individual is extraditable, it sends a certification of extraditability to the Secretary of State.  Opinion at 4 (citing Lewis Decl. ¶ 3).

Although the court's extradition certification is not directly appealable, the requested individual can challenge the certification of extraditability by petitioning the court for a writ of habeas corpus.  Opinion at 4 (citing Lewis Decl. ¶ 4; 28 U.S.C. § 2241).  In the habeas part of the judicial phase of extradition, the court considers "whether the judge had jurisdiction, whether the charged offense is covered by the terms of the treaty, and whether the evidence presented establishes probable cause that the fugitive committed the charged offense."  Opinion at 4 (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) ("[H]abeas corpus is available only to inquire whether the [judge] had jurisdiction, whether the offense charged is within the treaty and, by a

4

somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."); *Vo v. Benov*, 447 F.3d 1235, 1240 (9th Cir. 2006) ("The district court's habeas review of an extradition order is limited to whether: (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell within the treaty's terms, and (3) there is 'any competent evidence' supporting the probable cause determination of the magistrate.")).

Dr. Toledo was found "extraditable" under the U.S.-Peru Extradition Treaty on September 28, 2021.  Compl. ¶ 15.  Thereafter, Dr. Toledo petitioned for habeas corpus relief, which was denied on April 22, 2022.  *Id.*  Dr. Toledo appealed the habeas decision to the U.S. Court of Appeals for the Ninth Circuit.  *Id.*  After the Department separately finished its executive phase and issued the February 2023 extradition decision, Dr. Toledo sought for the Ninth Circuit to stay extradition pending the outcome of his appeal.  *Manrique v. Kolc*, No. 22-15705 (9th Cir.).  The Ninth Circuit granted this stay.  On April 5, 2023, a merits panel issued an order denying Dr. Toledo's motion, but the Ninth Circuit then permitted Dr. Toledo to seek en banc reconsideration.  *Id.*  The en banc panel denied the request for en banc reconsideration on April 18, 2023.  *Id.*

> **b.    The Executive Phase Requires The Department of State To Decide Whether To Extradite An Individual Found By Courts To Be Extraditable**

The Executive branch phase of extradition takes place in the Department of State after the courts have concluded in the judicial phase that the individual is extraditable.  The Department's policies and procedures govern its conduct in the executive phase, requiring the Department to gather, receive, and review information, but do not require it to afford any other process to the individual or his counsel.  Lewis Decl. ¶ 2.  If concerns of torture or mistreatment are raised (as they have been here, Compl., Ex. B, ECF 1), the Department must confirm that extradition

would comport with the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; the Department may also evaluate other humanitarian concerns across "[m]ultiple offices, bureaus, and country desks within the State Department."  Opinion at 5 (citing Lewis Decl. ¶¶ 4–7 & n.2; 22 C.F.R. § 95).  The government has said that Dr. Toledo "did not raise a specific fear of torture in his submissions to the State Department," Def.'s Opp'n at 12, n.5.  The government does not define what it means by a "specific fear of torture," but undersigned counsel did express concerns regarding prolonged pretrial detention, harsh and inhumane prison conditions, potential abuse or mistreatment, and potentially even death from this combination of circumstances.  *See*, *e.g.*, Compl., Ex. B at 24-26; Ex. D at 7 ("[W]e are very concerned that Dr. Toledo—at his advanced age and condition—may not survive the type of treatment and conditions he could face in pretrial detention in Peru").  Among the stated concerns were practices that the Department itself has criticized as human rights abuses[1] and conditions that the United Nations has recognized as violative of customary international law.[2]

Only the Department may consider such humanitarian concerns, including the possibility of mistreatment so severe as to cause death in pretrial detention.  As part of the executive phase, the Department may also consider any other information it deems relevant in the executive phase

---

[1] U.S. DEP'T OF STATE, PERU 2022 HUMAN RIGHTS REPORT (2023), https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/peru/ (noting Peru's indefinite and prolonged pretrial detention and describing Peruvian prison conditions as "generally harsh due to overcrowding, improper sanitation, inadequate nutrition, poor health care, and corruption among prison guards, who allegedly smuggled weapons and drugs into the prisons").
[2] *See, e.g.,* United Nations, Comm'n on Human Rights, *Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* ¶ 43, E/CN.4/2004/56 (Dec. 23, 2003), https://www.refworld.org/docid/45377acc0.html (lack of adequate access to medical care in detention); Manfred Nowak, United Nations, Human Rights Council, *Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment: Addendum* ¶ 234, A/HRC/13/39/Add.5, (Feb. 5, 2010), https://www.refworld.org/docid/4cf8f3192.html (prison overcrowding).

of the extradition process—including, specifically, information that courts are precluded from considering in the judicial phase. *See, e.g., Ordinola v. Hackman*, 478 F.3d 588, 605 (4th Cir. 2007) (only the Department may consider whether an extradition is politically motivated); *Hurtado v. United States Atty. Gen.*, 401 F. App'x 453, 456–57 (11th Cir. 2010) (only the Department may examine the requesting country's justice system); *United States v. Kin-Hong*, 110 F.3d 103, 111 (1st Cir.1997) (only the Department may consider "what awaits the [requested individual] in the requesting country").

The Court correctly notes that the requested individual may submit information to the Department, Opinion at 5 (citing Lewis Decl. ¶ 8), but there is no process beyond the review of those materials, *see* Lewis Decl. ¶ 8 (stating that the Department "will examine [the] materials"). Neither the individual nor his counsel are permitted to meet with Department officials, obtain information from the Department, ask questions of the Department, or rebut the facts and evidence underlying the decision. *See generally* Lewis Decl. ¶¶ 5-9. Unlike in the judicial phase, there are no proceedings involving the requested individual or his counsel; rather, the Department "considers all materials submitted" and then makes its decision. Opinion at 5-6 (citing Lewis Decl. ¶ 8).

At the close of the executive phase, the Secretary of State (or his designee) issues a final decision on extradition. Opinion at 6 (citing Lewis Decl. ¶ 9). This is a final agency decision that is not judicially reviewable. Opinion at 6 (citing Pl.'s Mem. Supp. Mot. Prelim. Relief ("Pl.'s Mem.") at 8, ECF No. 6).

Here, the Department reviewed materials—including written submissions from undersigned counsel—and the Deputy Secretary of State issued a final decision on February 21,

2023, announcing that the government would surrender Dr. Toledo for extradition to Peru.

Opinion at 8 (citing Lewis Decl. ¶ 3 n.1).

## II.     The Motion for Preliminary Relief

On March 7, 2023, Dr. Toledo filed the instant action claiming that the Department of

State violated his Fifth Amendment right to due process by deciding to extradite him based upon

the mere review of information, without any procedural steps or safeguards, such as disclosing

unclassified information and allowing him to rebut relevant facts, premises, or conclusions.  On

March 13, 2023, Dr. Toledo filed a Motion for Preliminary Relief seeking "a temporary

restraining order and/or preliminary injunction enjoining the government from revoking his bail,

taking him into custody, surrendering him for extradition, or otherwise taking any action that

would frustrate this Court's jurisdiction over this matter."  Pl.'s Mot. Prelim. Relief ("Pl.'s

Mot.") at 1, ECF No. 5.  The Court denied the Motion for Preliminary Relief on March 28, 2023.

On April 19, 2023, Dr. Toledo filed the instant motion requesting reconsideration of this

decision.

## LEGAL STANDARD FOR RECONSIDERATION

Federal Rule of Civil Procedure 54(b) provides that an interlocutory order, like the

Court's current order on preliminary relief, "may be revised at any time before the entry of a

[final] judgment."  Fed. R. Civ. P. 54(b).  Although Rule 54(b) does not specify the standard of

review applicable to these motions for reconsideration, they may be granted "as justice requires."

*United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 267 (D.D.C. 2016).

A court is "free to reconsider" any decision, opinion, and analysis prior to final judgment.  *See*

*id.* (granting a motion for reconsideration on a decision regarding motion for summary

judgment).  *See also Wultz v. Islamic Republic of Iran*, 762 F. Supp. 2d 18, 23 (D.D.C. 2011)

("[A] court has wide discretion in deciding a motion for reconsideration and can revise its earlier

decision if such relief is necessary under the circumstances.") (granting a defendant's motion to reconsider an initial denial of a motion to dismiss).  Reconsideration is an appropriate remedy if the movant's argument has been "misunderstood" or if there has been an error of "apprehension" of the arguments or authority.  *Id.*

## ARGUMENT

### I.    Dr. Toledo Was Right To Pursue His Due Process Claim In This Court

The Court rightly notes that Dr. Toledo "has chosen to bring his Fifth Amendment claim in a fresh lawsuit, before a different judge sitting on a different court, rather than in his ongoing habeas proceedings."  Opinion at 17.  This was not done for any inappropriate reason, however, such as to "avoid clearly unfavorable precedent extant in the Ninth Circuit."  *Id.*  Rather, Plaintiff filed this action in this Court for four reasons, each of which is appropriate and unrelated to avoiding unfavorable precedent.

First, it was appropriate to file here because this is the jurisdiction where Defendants are located.  Accordingly, as asserted in the Complaint, venue is proper under 28 U.S.C. § 1391(e)(1), which states that actions against U.S. officers may be brought "in any judicial district in which (A) a defendant in the action resides." Compl. ¶ 11 (citing 28 U.S.C. § 1391(e)(1)(A)); *see Starnes v. McGuire*, 512 F.2d 918, 925 (D.C. Cir. 1974) ("When the federal officers named as defendants are to be found within the District of Columbia for purposes of personal jurisdiction, venue is properly laid here under Section 1391(e).").  Here, the named Defendants—the Department of State and Deputy Secretary of State Wendy Sherman—and all the other employees involved in the executive phase of the extradition process are located here.  Venue is therefore proper here.

Second, it was appropriate to file in this Court because this is the jurisdiction where the challenged conduct occurred.  Accordingly, as stated in the Complaint, venue is proper here

under 28 U.S.C. § 1391(e)(1), which states that actions against U.S. officers may be brought "in any judicial district in which … (B) a substantial part of the events or omissions giving rise to the claim occurred …."  Compl. ¶ 11 (citing 28 U.S.C. § 1391(e)(1)(B)); *Vasser v. McDonald*, 72 F. Supp. 3d 269, 280 (D.D.C. 2014) (finding venue exists under 1391(e)(1)(B) when "the material events, decisions, and actions relating to [the plaintiff's claims] … occurred through [a U.S. official] in the District of Columbia").  Here, all of the events giving rise to Plaintiff's claim took place in this jurisdiction.  *See* 7 U.S. Dep't of State, Foreign Affairs Manual § 1635.1 (Nov. 15, 2022) (describing executive phase of extradition proceedings, all of which take place at the Department in Washington, D.C.); *see also* Lewis Decl. ¶¶ 5-9 (same).

Third, it was appropriate to file in this Court because this is where the relevant records and witnesses are located.  *See Lamont v. Haig*, 590 F.2d 1124, 1133-1134 (D.C. Cir. 1978) (urging courts to interpret and apply as Congress intended an earlier iteration of the venue statute at 28 U.S.C. § 1391(b), *i.e.*, with "a commonsense appraisal" of the "events having operative significance" and "the implications of those events for accessibility to witnesses and records").  Here, all of the relevant records and witnesses are located at the Department of State in Washington, D.C.   Venue is therefore proper here on this ground as well.

Fourth, undersigned counsel deemed it more appropriate to file the case here rather than in the U.S. District Court for the Northern District of California because of the limited scope of the proceedings in that court, the timing of the Department's decision in relation to those proceedings, and the lack of any connections between that court and the executive phase of the process here in Washington.  Dr. Toledo could not have brought his due process claim as part of the litigation on extraditability because that litigation was strictly limited to whether (1) the extradition treaty requirements were met, and (2) there was sufficient evidence to sustain the

charges.  Opinion at 4 (citing Lewis Decl. ¶¶ 2-3).  Similarly, Dr. Toledo could not have brought his due process claim as part of the habeas corpus proceedings in that court for reasons of both timing and substance.  First, as to timing, the habeas proceedings had concluded in the lower court by the time the due process claim here was ripe; specifically, the habeas corpus proceedings concluded on April 22, 2022, Opinion at 8 (citing *Manrique v. O'Keefe*, No. 21-CV-08395-LB, 2022 WL 1212018, at *14 (N.D. Cal. Apr. 22, 2022)), roughly ten months before the Department issued its extradition decision on February 21, 2023, Opinion at 8 (citing Lewis Decl. ¶ 3 n.1).  Second, as to substance, the habeas court could not have considered the instant due process claim because the habeas proceedings in an extradition case are strictly limited to "whether the judge had jurisdiction, whether the charged offense is covered by the terms of the treaty, and whether the evidence presented establishes probable cause that the fugitive committed the charged offense."  Opinion at 4 (citing *Fernandez 268* U.S. at 312; *Vo*, 447 F.3d at 1240).  Subsequently, Dr. Toledo could not raise these claims in his appeal to the U.S. Court of Appeals for the Ninth Circuit, *Manrique v. Kolc*, No. 22-15705, because the appellate court considers only issues raised below, where the due process claim was both beyond the scope of that litigation and also not yet ripe.

The Court is correct that Plaintiff brought his due process claim here when there were "two motions in the Ninth Circuit still pending" and "bail proceedings in the Northern District of California ongoing," Opinion at 10, but the limited scope and timing of those proceedings made it impossible to raise the due process issue there.  Moreover, undersigned counsel concluded—in consultation with the federal public defenders representing Dr. Toledo in those courts as part of the judicial phase of the extradition process—that it would not have been appropriate to initiate a new litigation in the Northern District of California.  The executive phase of the process took

place here in Washington, D.C. and has connections only to this jurisdiction; Washington, D.C.

is also where the Defendants are located, the events in question took place, and the records and

witnesses can be found.  For these reasons, undersigned counsel initiated the litigation in this

Court, rather than the Northern District of California.

## II.     Dr. Toledo Did Not Bring His Due Process Claim In This Court For Any Inappropriate Reason

Given the Court's expression of concern that Plaintiff may have engaged in forum

shopping, Opinion at 17, undersigned counsel wishes to stress that the choice of forum in this

Court was made in *good faith* and not made for any improper purpose, such as avoiding

precedent.  Specifically, contrary to the Court's concern, Plaintiff did not file his action in this

Court to avoid the Ninth Circuit's decision in *Lopez-Smith v. Hood*, 121 F.3d 1322 (9th Cir.

1997).  The Court has called that decision "clearly unfavorable" to Dr. Toledo, Opinion at 17,

but the court there rejected a due process challenge very different from this one.  There, the

appellant asked the lower court to "consider evidence addressing whether the United States

ought to exercise its discretion whether to extradite," which the court interpreted as a request to

substitute its own discretion for the Secretary of State's.  *Id.* at 1324.  Affirming the lower

court's rejection of that request, the Ninth Circuit reasoned that "evidence addressing the

exercise of discretion to extradite" is excluded from the judicial phase of extradition and

considered instead only in the executive phase by the Secretary of State.  *Id.* at 1326.  Here, in

contrast, Plaintiff readily accepts that the extradition decision rests exclusively with the

executive branch and has not asked this Court (or any other) to supplant the Secretary's

discretion with its own.  Compl. ¶ 1.  Plaintiff here merely asks this Court to ensure that he is

afforded due process in the executive phase of the proceedings before the Department surrenders

him to Peru.  *Id.*

The Ninth Circuit's decision in *Lopez-Smith* offers only passing speculation about what the executive phase of extradition might entail.  121 F.3d at 1326 ("We suppose there is nothing to stop Lopez–Smith's lawyer from putting together a presentation showing why the Secretary ought to exercise discretion not to extradite Lopez–Smith, and mailing it to the Secretary of State.").  Although the court added that whether and how the Secretary considers any such materials would not be subject to "judicial review," *id.*, it had no occasion to decide any issues relating to the executive phase of the extradition process because the executive phase had not yet concluded in that case, *id. Lopez-Smith* is not "clearly unfavorable" to Dr. Toledo (Opinion at 17), in part because the Ninth Circuit there was focused on the judicial phase and was not presented with a claim based on a lack of process in the executive phase.  In this sense, *Lopez-Smith* supports Plaintiff's view that the two phases are separate, and that the process due in one phase is different from the process due in the other.

In sum, Plaintiff filed his action in this Court not because he sought to avoid *Lopez-Smith*, but rather because he concluded for other reasons that it was the most appropriate forum for his claim.  For the avoidance of any doubt and to ensure that the Court's concerns are adequately and fully addressed, undersigned counsel respectfully renews Plaintiff's prior request for an opportunity to appear before the Court in person, at a hearing or oral argument on this motion.  Having an opportunity to appear in person before the Court is of critical importance, especially given the irreparable injury that Plaintiff will suffer—including not only the loss of his freedom, but potentially also the loss of his life—if he is erroneously deprived of liberty and extradited to Peru.

## III.    Dr. Toledo Is Likely To Succeed On The Merits of His Due Process Claim

Dr. Toledo respectfully submits that the Court erred in the analysis of his due process claim in two critical respects.  First, the constitutional sufficiency of the executive phase of

extradition does not depend on the adequacy of the "combination" of judicial and executive phases.  Opinion at 14-16.  Rather, the constitutional sufficiency of each phase should be assessed separately because each concerns different issues, occurs in a separate branch of government, and has its own due process requirements under the Constitution, *see*, *e.g.*, *Venckiene*, 929 F.3d at 863-864 (separately analyzing due process challenges to judicial phase and executive phase of extradition).  Second, despite the fact that Plaintiff had the benefit of "adversarial proceedings" in the judicial phase, Opinion at 14, the Department's mere "review" of materials in the executive phase failed to satisfy even the most minimal due process requirements under the Constitution, *see*, *e.g.*, *Ralls,* 758 F.3d at 319 ("[D]ue process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence.").

a.     **The Department of State Has An Independent Obligation To Afford Due Process In The Executive Phase of Extradition**

The Due Process Clause applies separately to the actions of the Department of State in the executive phase of extradition.  *See*, *e.g.*, *Venckiene*, 929 F.3d at 863-864 (separately analyzing due process claims in the executive phase of extradition); *Martin* 993 F.2d at 829 ("Extradition ultimately remains an Executive function.  After the courts have completed their limited inquiry, the Secretary of State conducts an independent review of the case …. The United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution.").

The government does not contest that the Department's conduct in the executive phase of extradition must "comport[] with due process."  Def.'s Opp'n. at 2, ECF 9.  Instead, it argues that multiple courts have applied the Due Process Clause to the executive phase of the process

and supposedly confirmed that "*the State Department's procedure* for determining whether to surrender a fugitive *comports with due process*." *Id.* (emphasis added). In the government's words, the executive phase is a "*separate and second phase* of the extradition process" that (1) begins only after "the judicial phase is complete"; (2) allows the Secretary to consider not only the narrow legal issues raised in the judicial phase but also "*any other considerations* for or against surrender"; and (3) culminates in a *final agency decision* "whether a fugitive should actually be extradited" to the requesting country. Oliver Lewis Decl. ¶ 4 (emphasis added).

Consistent with the government's contention that the executive phase of extradition is a "separate" procedure that "comports with due process," Plaintiff posits that the constitutional sufficiency of the procedure must be analyzed separately from the judicial phase that preceded it. The Court cites *Venckiene* for the proposition that courts analyze the "combination of the judicial and executive branch proceedings," Opinion at 16, but there the Seventh Circuit took the separate approach that Plaintiff advocates here. 929 F.3d 843. Specifically, the court in that case drew a sharp contrast between the "legal questions … for the courts" and "the foreign policy and humanitarian judgments left to the executive branch," 929 F.3d at 863-864, and assessed constitutional challenges to each of them separately, *id.* at 854-860 (first, analyzing "Challenges to the Magistrate Judge's Certification Order") and 860-864 (second, analyzing "Challenges to [t]he Secretary of State's Order"). Although the Seventh Circuit in that case—and the Fourth and Fifth Circuits in other cases—have held that the executive phase need only afford "minimal" process because it is preceded by other process in the judicial phase, *see*, *e.g.*, Opp at 16 (citing *Peroff v. Hylton*, 563 F.2d 1099, 1102–03 (4th Cir. 1977); *Escobedo v. United States*, 623 F.2d 1098, 1104–05 (5th Cir. 1980)), even these cases arguably have recognized that the Due Process

Clause applies separately to the two phases and that *some amount of constitutional process is due* in each, including the executive phase at issue here.

Given courts' consensus that some minimal amount of process is due in the executive phase of extradition, the question then is how much process is enough to satisfy the Due Process Clause. Some courts have said what is *not* required—*see*, *e.g.*, *Venckiene*, 929 F.3d at 863-864 (no hearing before the Secretary of State); *Peroff*, 563 F.2d at 1102–03 (same); *Escobedo*, 623 F.2d at 1104–05 (no specific standards for the Department to apply)—but we are not aware of any courts that have said precisely what *is* required. In the absence of authority on that critical question, we turned to authority in the D.C. Circuit in analogous contexts that we respectfully submit articulates a set of principles and a standard for meeting "minimal" due process requirements when the executive branch has exclusive authority to make a non-reviewable national security determination affecting a constitutionally protected right or interest. *See*, *e.g.*, Pl.'s Mem. at 1-2 (citing *Ralls*, 758 F.3d at 318-320; *Greene v. McElroy*, 360 U.S. 474, 496 (1959); *Nat'l Council of Resistance of Iran (NCRI) v. U.S. Dep't. of State*, 251 F.3d 192, 205 (D.C. Cir. 2001); *Gray Panthers v. Schweiker*, 652 F.2d 146, 165 (D.C. Cir. 1980)).

This Court distinguishes the D.C. Circuit's due process cases primarily on the ground that they involve "standalone administrative determinations that in and of themselves have the potential to deprive the interested party of life, liberty, or property," Opinion at 14, but the same can be said of the Department's extradition determination here. Here, the executive phase of extradition culminated in a "standalone administrative determination" to extradite Dr. Toledo, made by the Deputy Secretary of State Wendy Sherman, following a review process by Department staff, without any involvement or oversight by any court or other part of government. *See generally* Lewis Decl. at ¶¶ 5-9 (describing the Department's review and

decision-making).  Moreover, the decision here—has more than just the "potential" to "deprive the interested party of life [and] liberty."  Indeed, the immediate loss of liberty would be the certain result of extradition in this case.

It is true that the Department's determination does not "stand in a vacuum" because it comes after adversarial proceedings before several judges, Opinion at 14, but it is nonetheless also a "standalone administrative determination" because the judicial proceedings have no impact on the work of the Department and the judiciary has no authority to direct or review the Department's determination.  Instead, the determination is made by the Department alone, based upon information gathered and examined in an independent agency review.  *See* Lewis Decl. ¶¶ 3-4; *see also Martin*, 993 F.2d at 829 ("Extradition ultimately remains an Executive function. After the courts have completed their limited inquiry, the Secretary of State conducts an independent review of the case ….").  Moreover, the executive phase stands apart from the judicial phase in terms of the issues to be reviewed and decided.  Whereas the courts conducting the judicial phase are "not permitted to inquire beyond whether (1) the extradition judge had jurisdiction to conduct extradition proceedings; (2) the extradition court had jurisdiction over the fugitive; (3) the treaty of extradition was in full force and effect; (4) the crime fell within terms of the treaty; and (5) there was competent legal evidence to support a finding of extraditability," *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) (citing *Fernandez*, 268 U.S. at 312), the Department conducting the executive phase has exclusive authority to make the final extradition decision and, in so doing, has "broad discretion and may consider myriad factors, including humanitarian and foreign-policy considerations," Def.'s Opp'n at 4 (citing cases).  Under these circumstances, the constitutional sufficiency of the process in the judicial phase should be assessed and analyzed separately from that of the executive phase.  *See Venckiene*, 929 F.3d at

863-864 (separately applying the Due Process Clause to the judicial and executive phases of extradition).

In addition, the Department's process is unique because it is the sole authority that may consider the gravest of Dr. Toledo's concerns.  For example, only the Department—and not any court that has reviewed the request to-date—may examine whether Peru's motivation for requesting Dr. Toledo is politically motivated.  *See Ordinola*, 478 F.3d at 605 ("Any question into the Peruvian government's motivations is therefore well beyond this Court's legitimate realm of authority under the Treaty and must be addressed solely to the Secretary of State."), *citing Eain v. Wilkes*, 641 F.2d 504, 513 (7th Cir. 1981).  In addition, the Department is the sole authority for assessing the fundamental fairness of Peru's criminal justice system.  *See Hurtado*, 401 F. App'x at 456–57.  This is critically important here, where Peru's criminal justice system is among the worst in the world—ranked 115 out of 140 countries overall and ranked 133 out of 140 countries in terms of "timely and effective" handling of criminal adjudications.[3]  And the Department's process is the only process that examines what awaits Dr. Toledo in Peru—here, likely prolonged pretrial detention, a lack of due process, and possibly serious illness or even death without ever seeing the inside of a courtroom.  *See Kin-Hong*, 110 F.3d at 111 (only the Department may consider "what awaits the [requested individual] in the requesting country").  On each of these critical considerations, where the Department is the sole U.S. institution with authority to this information into account, there are essentially no procedural safeguards and no processes that involve Dr. Toledo.  Although his liberty and possibly also his life are at stake, Dr.

---

[3] World Justice Project 2022 Rule of Law Rankings, https://worldjusticeproject.org/rule-of-law-index/country/2022/Peru/Criminal%20Justice/ (Peru ranks 115 out of 140 countries for its criminal justice system, generally; scrolling down at this page shows that Peru ranks 133 out of 140 countries for the sub-factor of whether "criminal adjudication is timely and effective").

Toledo was never allowed to meet with anyone in the Department, never provided any information by the Department, and never allowed to see and rebut any of the unclassified facts and information relating to the Department's decision.  It is no answer that Dr. Toledo received due process in the judicial phase of the extradition process, as his liberty turns on a decision in the executive phase made by the Department, which reviews and decides an issue not before the courts, based on information not before the courts.  Due process before the Department is therefore a constitutional imperative.

> **b.** **The Department of State's Mere Review of Materials Did Meet Due Process Requirements**

"[T]he amount of process 'due' in a given situation turns on the balancing of (1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'"  Opinion at 15 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 355 (1976)).  Here, the Court concluded that only the first factor favors Plaintiff, but Plaintiff respectfully submits that all three factors favor him and tilt against the government.

> **i.** **Dr. Toledo Has a Strong "Private Interest" In Life and Liberty**

Dr. Toledo's private interests in these matters are difficult to overstate.  His liberty is at stake because the Department of State's decision means that he will be taken into custody by federal agents and surrendered to Peru, where he will be held in pretrial detention.  Compl. ¶ 7 ("The tragic reality is that extradition to Peru in these circumstances is very likely the equivalent of a pretrial death sentence. This case is not merely about Dr. Toledo's liberty …. He is unlikely to survive in harsh pretrial detention conditions long enough to see the inside of a Peruvian

courtroom."); *see also id.* ¶¶ 6, 8, 36, 42, 52.  As the Court has acknowledged, Dr. Toledo's

"private liberty interest is indisputably implicated by his extradition proceedings."  Opinion at

15.  Peruvian authorities have said that they will hold him pretrial detention, Compl. ¶ 36,

pending any trial, which may never occur.  His life may also be at stake because he is 78 years

old and in poor health, making it unlikely that he can survive the prolonged isolation and abusive

conditions of Peruvian pretrial detention.  Compl. ¶ 7.

> ### ii.     Additional Procedural Safeguards Are Needed To Mitigate The Risk of An Erroneous Deprivation Of Liberty

More procedural safeguards are needed here to mitigate the risk of an erroneous

deprivation of liberty.  This is because the Department's "process" here consisted of gathering

and reviewing information, without affording any procedural safeguards at all.  *See* Lewis Decl.

¶¶ 5-9.  Although the Department reviewed written materials from Dr. Toledo's counsel, it

refused to meet with Dr. Toledo or his counsel.  Compl. ¶¶ 5, 37-49.  The Department also

refused to provide Dr. Toledo or his counsel any information, such as the unclassified facts,

evidence, premises, or conclusions underlying its decision.  *Id.*  The Department failed to provide

any opportunity for the exchange of views; and failed to afford Plaintiff and his counsel any

opportunity to rebut any of the Department's information.  *Id.*  In short, the Department refused

to do anything involving Plaintiff beyond accepting and reviewing his written submissions.

This falls short of the due process necessary to protect against a potential erroneous

deprivation of constitutionally-protected liberty.  Even in unreviewable agency decisions dealing

with national security and foreign policy, the Due Process Clause requires executive agencies to

reveal the unclassified premises and conclusions that underlie their decisions and to afford

affected individuals the opportunity to rebut the facts and arguments against them.  *See e.g.*,

*Ralls*, 758 F.3d at 319 ("[D]ue process requires, at the least, that an affected party be informed of

the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (requiring "notice of the factual basis for [the government's decision], and a fair opportunity to rebut the government's factual assertions before a neutral decisionmaker"); *People's Mojahedin Org. of Iran* (*PMOI*) *v. U.S. Dep't. of State*, 613 F.3d 220, 227 (D.C. Cir. 2010) (per curiam) (requiring the sharing of unclassified material upon which the Department relied and that the affected party have the opportunity to present and rebut the administrative record); *NCRI*, 251 F.3d at 209 (same); *Chai v. U.S. Dep't. of State*, 466 F.3d 125, 132 (D.C. Cir. 2006) (same).

The Court has said that Dr. Toledo's ability to submit written materials, and to supplement those written materials with yet more written materials, constitutes sufficient process in light of all the prior judicial proceedings "in which [Dr. Toledo] has already been a participant." Opinion at 14. But the ability to participate in judicial proceedings regarding threshold legal questions in the judicial branch does not satisfy one's constitutional right to process in a different branch of government that is responsible for deciding a different issue, based upon different information, in an entirely separate process. Key constitutional and practical principles make clear that one branch's process cannot be a substitute for the process that is due from another branch. *See, e.g., Den ex dem. Murray v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 276 (1855) (Fifth Amendment's Due Process Clause "is a restraint on the legislative as well as on the executive and judicial powers of the government"); *PMOI*, 613 F.3d at 223 (describing what is required of the executive versus what is required of the judiciary before designating a foreign terrorist organization).

The mere review and consideration of information, standing alone, is obviously insufficient to meet the Due Process Clause.  The Court has pointed out that the Department's "review" follows prior judicial proceedings "in which [Dr. Toledo] has already been a participant," Opinion at 14, but the ability to participate in judicial proceedings focused on certain narrow legal questions is no substitute for due process regarding an executive decision regarding a different question.  Notwithstanding the prior judicial proceedings regarding issues of "extraditability," Dr. Toledo has an additional right to due process in executive proceedings regarding the *ultimate decision of whether he will be extradited and surrendered to Peru.  See Venckiene* 929 F.3d at 863-864 (analyzing the executive phase of extradition separate and apart from the judicial phase and holding that an individual has a right to due process in the executive phase); *Martin*, 993 F.2d at 829 (holding that extradition is fundamentally an executive process in which the individual has a right to due process).  Although we are not aware of any court analyzing and deciding precisely what process is due in the executive phase of extradition, the D.C. Circuit has articulated "minimal" due process in other analogous executive branch processes.  Those decisions are instructive here and they hold that the process due in connection with an executive decision affecting liberty or property includes, at a minimum, the right to receive and rebut the unclassified factual evidence underlying the decision.  *Ralls*, 758 F.3d at 319 ("[D]ue process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence."); *Hamdi*, 542 U.S. at 533 (requiring "notice of the factual basis for [the government's decision], and a fair opportunity to rebut the government's factual assertions before a neutral decisionmaker"); *PMOI*, 613 F.3d at 227 (requiring the sharing of unclassified material upon which the Department relied and that the

affected party have the opportunity to present and rebut the administrative record); *NCRI*, 251

F.3d at 209 (same); *Chai*, 466 F.3d at 132 (same).  *C.f. FBME Bank*, 209 F. Supp. 3d at 328-329

(due process was met because the agency summarized supporting evidence against the bank,

engaged the bank in "extensive dialogue, including face-to-face meetings," and considered

"voluminous written submissions").

The government asserts that Dr. Toledo is not entitled to know the allegedly sensitive

*thinking or reasons* behind the Department's decision to extradite him, Def.'s Opp'n at 22 (citing

Lewis. Decl. ¶¶ 7, 11-14), but this is not what he seeks.  Rather, he seeks the disclosure of the

unclassified evidence underlying the decision, so that he can then have a meaningful opportunity

to rebut that evidence. Compl., ¶¶ 5-6, 23, 37, 59 (complaining that the Department did not

provide access to unclassified facts, premises, findings, policies, or evidence on which the

Department's decision was based or an opportunity to rebut this record; *not* complaining that the

Department withheld its "thinking" or deliberations).  The D.C. Circuit has held in analogous

contexts that the Due Process Cause entitles the party whose liberty or property is at stake to at

least some amount of unclassified information and an opportunity to rebut it.  *See, e.g.*, *Ralls*,

758 F.3d at 319-320 (citing *McElroy*, 360 U.S. at 496; *NCRI*, 251 F.3d at 208-209; *Schweiker*,

652 F.2d at 165).  Here, the Department declined to produce any evidence or other factual

information, refused to afford Dr. Toledo or his counsel any meaningful opportunity to rebut

such information, and denied any other procedural protections or safeguards against an erroneous

deprivation of liberty.

Under D.C. Circuit authority in analogous contexts, "this lack of process constitutes a

clear constitutional violation, notwithstanding the [Department's] substantial interest in national

security and despite [any] uncertainty that more process would have led to a different

23

[Executive] decision." *Ralls*, 758 F.3d at 320 (citations omitted). "As the [foreign terrorist organization] cases make plain, a substantial interest in national security supports withholding only the classified information but does not excuse the failure to provide notice of, and access to, the unclassified information used [in the executive decision-making]." *Ralls*, 758 F.3d at 20 (citing *NCRI*, 251 F.3d at 208-209). "That [Dr. Toledo] had the opportunity to present evidence to [the Department] and to interact with it, then, is plainly not enough to satisfy due process because [he] never had the opportunity to tailor [his] submission to the [Department's] concerns or rebut the factual premises underlying the [Department's decision]." *Ralls*, 758 F.3d at 320 (citing *McElroy*, 360 U.S. at 496; *NCRI*, 251 F.3d at 205).

Contrary to the government's suggestion, Plaintiff also has not "ask[ed] this Court to compel what *Ralls* disclaimed: "an explanation of why the executive branch exercised its Article II discretion in a particular way on a sensitive matter implicating foreign policy and national security." Def.'s Opp'n at 16 (citing cases but not Dr. Toledo's Complaint). Instead, as explained, Dr. Toledo seeks only what the D.C. Circuit said he has a right to receive from the government, which is the "unclassified evidence on which the official actor relied" and an opportunity to rebut it. *Ralls*, 758 F.3d at 319. Nor is it correct that *Ralls* did not implicate the Executive's Article II powers. Def.'s Opp'n at 16 (citing *Ralls*). Rather, in *Ralls*, the D.C. Circuit considered the *exact same Article II argument* that the government makes here and *expressly rejected it*, holding that the plaintiff in that case was entitled to additional process even though the government argued that it would impinge on the discretion of the President to make national security judgments "constitutionally committed to the Executive Branch." 758 F.3d at 314. The D.C. Circuit rebuffed the government's strawman, stating:

> We disagree. First, Rall's due process claim does *not* challenge (1) the President's determination … [regarding] national security or (2) the President's prohibition of the

transaction in order to mitigate the national security threat.  Much like the political question we declined to consider in [*People's Mojahedin Organization of Iran v. Department of State (PMOII)*, 182 F.3d 17 (D.C. Cir. 1999)], reviewing *these* determinations would require us to exercise such judgment in the realm of foreign policy and national security. But Ralls does not request that we exercise such judgment. Instead, Ralls asks us to decide whether the Due Process Clause entitles it to have notice of, and access to, the evidence on which the President relied and an opportunity to rebut that evidence before he reaches his non-justiciable (and statutorily unreviewable) determinations … We think it clear, then, that Ralls's due process claim does not encroach on the prerogative of the political branches, does not require the exercise of non-judicial discretion and is susceptible to judicially manageable standards.  To the contrary, and as the Supreme Court recognized long ago, interpreting the provisions of the Constitution is the role the Framers entrusted to the judiciary.  *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012))].

*Ralls,* 758 F.3d at 314.  Just as the President could not use his national security and foreign affairs powers to avoid constitutional due process obligations regarding property interests in *Ralls*, so too the Department of State cannot invoke those same constitutional powers in the context of extradition to avoid due process obligations regarding Dr. Toledo's liberty interests here.  As the D.C. Circuit has explained, the constitutional power to make non-reviewable, discretionary decisions regarding national security and foreign policy does not relieve executive officials of the duty to afford reasonable procedural safeguards when constitutionally protected liberty or property interests are at stake.  *Id.*; *see also id.* 317-319.

It is also wrong that the liberty interest in the context of a wartime detention in *Hamdi*, 542 U.S. at 533, is "weightier" than the liberty interest in the context of an extradition decision here, Opinion at 13 (quoting and endorsing Def.'s Opp'n at 20).  To the contrary, the liberty interest here is weightier because Dr. Toledo—unlike the detainee in *Hamdi*—will not be in the custody of a law-abiding country like the U.S. government.  Rather, he will be surrendered to the

criminal justice system in Peru, which ranks 133 out of 140 countries in terms of whether its

"CRIMINAL ADJUDICATION SYSTEM IS TIMELY AND EFFECTIVE."[4]

The Court also notes that the D.C. Circuit's holdings in *NCRI*, *Chai*, and *PMOI* related to

a statutory scheme that "strictly limited" the participation of an alleged foreign terrorist

organization ("FTO") in the judicial review of the Department's FTO designation decision.

Opinion at 13.  This same issue is present here: Dr. Toledo's participation has been "strictly

limited" in the judicial phase of his extradition proceedings.  There, the courts have considered

only "whether the judge had jurisdiction, whether the charged offense is covered by the terms of

the treaty, and whether the evidence presented establishes probable cause that the fugitive

committed the charged offense."  *Id.* at 4.  The limitations on judicial review in this case are

analogous to the limitations on judicial review of the Department's FTO designations.

Accordingly, for all the reasons that the FTOs in *NCRI*, *Chai*, and *PMOI* were entitled under the

Constitution to have access to—and rebut—relevant unclassified material upon which the

Department's designation rested, *PMOI*, 613 F. 3d at 231 (failure of Secretary of State to provide

required notice and unclassified material to organization in advance of her FTO decision was a

non-harmless violation of due process); *NCRI*, 251 F.3d at 208-209 (Secretary of State must

"provide notice of those unclassified items upon which he proposes to rely" to the FTO prior to

designation to satisfy due process); *Chai*, 466 F.3d at 132 (requiring that the Department "notify

[the suspected FTO] of its impending designation as a FTO and of the unclassified items upon

which the Government proposes to base that designation"), Dr. Toledo is likewise entitled under

the Constitution to at least that much process here.  It is no answer that he has already received

---

[4] See World Justice Project 2022 Rule of Law Rankings, https://worldjusticeproject.org/rule-of-law-index/factors/2022/Peru/Criminal%20Justice (ranking the "timel[iness] and eff[icacy]" of Peru's "[c]riminal [a]djudication [s]ystem['s]" below Russia, Iran, Afghanistan, and China).

due process in the judicial phase; as discussed, *supra* at 10-13, the executive phase is a separate administrative process to which the Due Process Clause also applies, *see*, *e.g.*, *Venckiene*, 929 F.3d at 863-864.

Although the Seventh Circuit in *Venckiene* rejected the due process challenge to the executive phase of the proceedings on the merits, it did so on the ground that the individual in that case had requested more than the Due Process Clause requires. *Id.* at 863-864 (rejecting individual's due process challenge on the ground that he was not entitled to a full hearing before the Sectary of State). As previously discussed, the Ninth Circuit reached the same conclusion in *Lopez-Smith*. 121 F.3d at 1326. Other courts have likewise rejected due process challenges to the Department's processes on the merits, Opinion at 16 (citing cases), but none of those courts examined the process used here and held that the Department can decide to extradite a U.S. resident without disclosing any information to him or affording him even a minimal opportunity to rebut the facts or evidence underlying the Department's decision.

Here, the disclosure of information and the opportunity to rebut it is particularly important because of the serious risk that the prosecution of Dr. Toledo may be politically motivated, subject to improper influence, or even fundamentally corrupt. *See*, *e.g.*, Compl. ¶¶ 7-8, 32-36, Ex. B. This risk stems from a host of factors, including the fact that Peru's criminal justice system is among the worst in the world, suffers from political manipulation and corruption, and lacks the necessary independence and impartiality to render justice in this case. *See*, *e.g.*, *id.* ¶¶ 8, 45, 52; *see also* U.S. DEP'T OF STATE, PERU 2022 HUMAN RIGHTS REPORT (2023), https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/peru/; World Justice Project 2022 Rule of Law Rankings, https://worldjusticeproject.org/rule-of-law-index/factors/2022/Peru/Criminal%20Justice. Dr.

Toledo is a particularly vulnerable target in Peru because of his progressive politics, groundbreaking presidency, and indigenous ethnicity.  Politically, Dr. Toledo is a moderate progressive who has spent his entire professional life working to promote and defend Peruvian democracy, human rights, rule of law, economic opportunity, and other values and principles he first learned and acquired as a student in the United States.  Compl. ¶¶ 27-31, Ex. B.  His presidency was groundbreaking because he unseated the extremist, far-right dictatorship of Alberto Fujimori and implemented policies that made Peru more just, rules-based, democratic, and prosperous.  *Id.*  His ethnicity is significant because he was the first indigenous Peruvian ever elected President of Peru, *id.* ¶ 28, which continues to suffer from racial and ethnic prejudice, inequality, and conflict, *see, e.g.,* McFarland Sánchez-Moreno, *Democracy is on the Line in Peru*, Human Rights Watch (Jan. 24, 2023), https://www.hrw.org/news/2023/01/24/democracy-line-peru.

One result of Dr. Toledo's politics, presidency, and ethnicity are that he has powerful political enemies in Peru, including especially the "Fujimorists" who continue to hold considerable power in Peruvian institutions.  Compl. ¶¶ 28, 32, 35.  The government attempts to downplay this fact by point outing that Keiko Fujimori herself has been investigated and imprisoned, Def.'s Opp'n at 19, n.9, but this badly misunderstands the state of Peruvian politics.  The reality is that Keiko Fujimori remains a powerful political figure on the far-right and that other far-right Fujimorists remain powerful, well-placed in government, and capable of influencing, manipulating, or entirely corrupting a criminal case such as this one.  *See, e.g.,* McFarland Sánchez-Moreno, *supra.*  Even as a more general matter, Peru's criminal justice system suffers from the politicization of prosecutorial power, which has been turned on Peruvian presidents for the past three-and-a-half decades.  Indeed, every former president of Peru since

1990 is either in jail, has been in jail, or has faced a detention order.[5]  One former president, Alan Garcia, committed suicide when police came to arrest him and put him in pretrial detention.[6]  Presidents in Peru should be impeached and prosecuted for the crimes they commit, but the concern here is that Dr. Toledo is being prosecuted for political reasons and that Peruvian courts are not sufficiently independent and impartial to render justice in a case such as this. Compl. ¶¶ 8, 34-35.  The point is not to litigate these facts in this Court, but rather to explain why it is so important to have *minimal* procedural safeguards at the Department of State, which is *the only U.S. institution* with the authority to consider these issues.

Under these circumstances, the risk of an erroneous deprivation of liberty requires some or all of the additional safeguards that Dr. Toledo requests.  Compl. at 22 ("REQUESTED RELIEF"); *see also Ralls*, 758 F.3d at 319 ("[D]ue process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence."); *Hamdi*, 542 U.S. at 533 (requiring "notice of the factual basis for [the agency's decision], and a fair opportunity to rebut the [agency's] factual assertions before a neutral decisionmaker"); *PMOI*, 613 F.3d at 227 (requiring that the Department notify the affected party of the unclassified material upon which the agency relied and that the affected party have the opportunity to present and rebut the administrative record and presumptions against it); *NCRI*, 251 F.3d at 209 (requiring the

---

[5] Rochabrun, Marcelo, *Peru Is Running Out of Space to Keep its Jailed Ex-Presidents*, Bᴌᴏᴏᴍʙᴇʀɢ (Feb. 24, 2023), https://www.bloomberg.com/news/articles/2023-02-24/peru-is-running-out-of-space-to-keep-its-jailed-ex-presidents#:~:text=The%20politically%2Dvolatile%20Andean%20nation,has%20faced%20a%20detention%20order.&text=After%20a%20lengthy%20process%2C%20Peruvian%20officials%20said%20Feb.

[6] Alan García: Peru's Former President Kills Himself Ahead of Arrest, BBC NEWS (Apr. 17, 2019), https://www.bbc.com/news/world-latin-america-47965867.

Secretary of State afford the affected party "the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the [agency's presumption]"); *Chai*, 466 F.3d at 132 (requiring the Department to provide "the right to be heard at a meaningful time and in a meaningful manner," "the unclassified items" upon which the agency relied, notice of an impending agency decision, and the opportunity to rebut the agency's evidence and presumptions).

### iii.    The Burdens of Additional Process on the Government Are Minimal

The government's purported concerns regarding national security and undue burden, Def.'s Opp'n at 22, are overstated and off-base.  Dr. Toledo seeks only the disclosure of relevant unclassified information sufficient to rebut the facts, premises, and conclusions underlying the Department's decision.  Due process here would not mean that the Department must disclose classified information, reveal sensitive deliberations, or disclose confidential communications with foreign governments.  *See Ralls*, 758 F.3d at 319-321 (holding that due process requires only notice of the official action, access to the unclassified evidence on which the official actor relied, and an opportunity to rebut that evidence).  This process could be completed through an exchange of documents or digital materials—excluding classified materials—followed by informal meetings or discussions.  The government claims that the burdens of such process would be too great, yet the government already provides such process to others, including suspected terrorists, enemy combatants, and foreign companies whose property rights are at stake.  *See Ralls*, 758 F.3d at 319; *Hamdi*, 542 U.S. at 533; *PMOI*, 613 F.3d at 227; *NCRI*, 251 F.3d at 209; *Chai*, 466 F.3d at 132.

## IV.    The "Evidence" In Peru's Criminal Case Is Flawed and Unreliable

The government exaggerates the strength of the evidence implicating Dr. Toledo, *see* Def.'s Opp'n at 19, n.9, which Plaintiff sought to highlight in its Motion for Preliminary Relief.

Pl.'s Mem. at 9-11.  Merely as an example, the government cites the testimony of one of Peru's key witnesses, Jorge Barata, but neglects to mention that, in related proceedings, Peruvian prosecutors have been recorded coaching witnesses to alter their testimony to match Mr. Barata's, in order to "agree with the prosecution's line."[7]  The government also fails to acknowledge the significance of the fact that Peru's other key witness, Josef Maiman, only implicated Dr. Toledo when Peruvian prosecutors promised that Mr. Maiman and his family could keep $20 million in criminal proceeds in exchange for his changed testimony.  Compl., Ex. B at 21.  The government claims Mr. Maiman was cross-examined because he was deposed (on a circumscribed set of topics) before he died, but this ignores that Dr. Toledo will have no opportunity to confront his accuser and that Dr. Toledo's counsel will have no opportunity to cross-examine him *at trial*.  *Id.*  It is also troubling that any trial in this case would occur 17 years (or more) after Dr. Toledo left office, such that witnesses have died, memories have faded, and evidence has been lost.  The U.S. government has the authority to extradite individuals to face prosecutions that it would never bring in this country, but this authority should have its limits.  Peru's pursuit of an elderly man using stale, tainted, or corrupt evidence is fundamentally wrong and should not have the support of the U.S. government.

Even the U.S. court that certified extraditability warned that "[t]here are contradictions between the two principal witnesses against him and inconsistencies in each witness's statements over time."  Order re: Motion to Deny Extradition Request, *In re Extradition of Alejandro Toledo Manrique*, No. 3:19-mj-71055-MAG (N.D. Cal. Sept. 4, 2020), ECF 147.  In the

---

[7] Neves et al., *In Peru's Operation Car Wash, Prosecutors and Witness Doctored Testimony to Avoid Contradictions*, The Intercept (Nov. 3, 2019), https://theintercept.com/2019/11/03/peru-operation-car-wash-prosecutors/ (recording a prosecutor instruct the prosecution's witness: "Whatever you tell us, it has to agree with the prosecution's line").

government's purported effort to set the record straight, Def.'s Opp'n at 19, n.9, it omitted

mention of those inconsistencies and the possible prosecutorial coaching and incentives that may

have created or resulted in those inconsistencies.  With adequate process at the Department,

those facts could be properly developed and debated in the executive phase of the process.   Dr.

Toledo and his counsel would then have an opportunity to establish that the so-called evidence in

this case is no more reliable than the Peruvian criminal justice system that produced it.  Without

that process, however, Dr. Toledo will never know—much less have a meaningful opportunity to

rebut—the purported evidence that formed the basis for the Department's decision.

Plaintiff will never receive due process or a fair trial in Peru and, for this reason, it is

imperative that he receive the minimal constitutional process he is due under the Constitution

before being sent there.

## V.    Dr. Toledo Renews His Request For Oral Argument

Given what is at stake in these proceedings, Plaintiff previously requested oral argument

on the Motion for Preliminary Relief.  *See* Pl.'s Mot. Prelim. Relief at 1, ECF No. 5 (stating

"ORAL ARGUMENT REQUESTED").  For the same reason, Dr. Toledo respectfully requests a

hearing and oral argument on this Motion for Reconsideration.

*            *            *

Pursuant to Local Rules 7(m) and 65.1, undersigned counsel for Dr. Toledo hereby states

that he has conferred with counsel for Defendants regarding Dr. Toledo's Motion for

Reconsideration (which Defendants oppose).

Dated:  April 19, 2023                                    Respectfully submitted,

                                                          /s/ David Bowker
                                                          David Bowker
                                                          (D.C. Bar. No. 989309)
                                                          WILMER CUTLER PICKERING HALE AND DORR LLP
                                                          2100 Pennsylvania Avenue NW
                                                          Washington DC 20037
                                                          Phone: (202) 663-6000
                                                          Facsimile: (202) 663-6363
                                                          David.Bowker@wilmerhale.com

                                                          Kelsey Quigley
                                                          (*pro hac vice* forthcoming)
                                                          WILMER CUTLER PICKERING HALE AND DORR LLP
                                                          2600 El Camino Real
                                                          Suite 400
                                                          Palo Alto, California 94306
                                                          Phone: (650) 858-6000
                                                          Facsimile: (650) 858-6100
                                                          kelsey.quigley@wilmerhale.com

                                                          *Counsel for Plaintiff*